UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TEXAS BRINE COMPANY, LLC AND<br>LOUISIANA SALT, LLC | CIVIL ACTION:<br><br>NO. 15-1102 - KDE - JVM<br>c/w 15-3324 |
| VERSUS | |
| THE DOW CHEMICAL COMPANY,<br>DOW HYDROCARBONS & RESOURCES,<br>LLC, AND CLIFTON LAND CORPORATION | SECTION "N" (1) |

## ORDER AND REASONS

Presently before the Court is the "Motion for Partial Summary Judgment pursuant to the Federal Rules of Civil Procedure 56," filed by Defendants The Dow Chemical Company and Dow Hydrocarbons & Resources, LLC (collectively, "Dow") and Clifton Land Corporation (Rec. Doc. 77).[1] Plaintiffs Texas Brine Company, LLC and Louisiana Salt, LLC (collectively, "TBC") have opposed the motion.[2] Having carefully considered the parties' submissions, the record in this matter, and applicable law, **IT IS ORDERED** that Defendants' motion is **DENIED** for the reasons set forth herein.

---

[1] Defendants Dow and Clifton are alleged to be an "owners, and/or lessees and/or operators of property located in Assumption Parish, more particularly described as follows: A portion of the Southeast Quarter of Section 41, Township 12 South, Range 13 East, Assumption Parish, Louisiana (the "Dow/Clifton Property"), [which is] adjacent to the north of the Property." *See* Rec. Doc. 92, at ¶¶ 9-11.

[2] At the time suit was filed, TBC owned certain property located in Assumption Parish, more particularly described as follows: A portion of Section 46, Township 12 South, Range 13 East, Assumption Parish, Louisiana (the "Property"). *See* Rec. Doc. 84, p. 8. TBC owned the property from December 2002 until October 2015, when it transferred ownership to Louisiana Salt, LLC ("Salt") as of October 1, 2015. *Id.* Salt was added as a plaintiff in the "Third Supplemental, Amended, and Restated Complaint." *See* Rec. Doc. 84, p. 8; Rec. Doc. 92, at ¶¶ 9-10.

**I.     BACKGROUND**

In 1986, Dow began operating a solution-mining salt cavern on the Napoleonville Salt Dome in Assumption Parish, Louisiana. Dow's Well 971667 (hereinafter, "Dow 18") was mined from 1986 through September 2010. During the course of Dow's operations, the Dow 18 cavern did not develop uniformly; rather, it developed an anomaly or "wing" extending toward the boundary between Dow's property and adjacent property owned by TBC.[3] Following cessation of its solution-mining operations in 2010, Dow implemented pressure-monitoring and pressure-management plans for Dow 18, which include continuous monitoring of the well data and daily inspections of the well and well pad area.[4]

In February 2014, the Louisiana Department of Natural Resources promulgated regulations intended to advance the physical and environmental safety of solution-mining caverns. *See* La. Administrative Code §43:3301, *et seq*.; 2014 LA REG TEXT 340934 (NS). The regulations were amended in 2016. *See* La. Administrative Code §43:3301, *et seq*.; 2016 LA REG TEXT 406959 (NS). One of the regulations prohibits any part of a solution-mining cavern in existence as of the promulgation date of the regulations from extending closer than 100 feet from the property of an adjacent owner without the consent of the other owners(s) or a determination by the Louisiana

---

[3]     *See* Rec. Doc. 77-2 at p. 7 of 27 and p. 12 of 27.
[4]     Dow refers to the latter operation as being part of its "Out of Service Pressure Monitoring plan." *See* Rec. Doc. 77-2 at p.8. "The purpose of Dow's Out of Service Pressure Monitoring plan is to ensure the salt cavern's pressure remains within a safe pressure range as required by the Louisiana Department of Natural Resources. For the same reason, Dow also periodically 'de-pressures' the well, as needed, by injecting freshwater into the salt cavern's brine casing in order to wash salt from inside the casing." *See* Rec. Doc. 77- 2 at p.8. In its Second Amended Complaint, TBC additionally claims that "Dow's current operation and monitoring of the Dow # 18 Well is causing further encroachment of the # 18 Well cavern onto TBC's Property." *See* Rec. Doc. 55, ¶¶ 39, and 42-52. Dow's instant motion for partial summary, however, expressly excludes TBC's claim based on Dow's "Out of Service Pressure Monitoring plan" from its coverage. *See* Rec. Doc. 77-2 at p.8.

Commissioner of Conservation ("Commissioner") that operations may continue. *See* La. Administrative Code §43:3315(B)(1)(a). That regulation also requires an operator with an existing solution-mining cavern located within 100 feet of an adjacent property line to provide notice of the encroachment to the adjacent owner. *Id.*

Another regulation requires a minimum separation of not less than 200 feet "between the walls of adjacent caverns or between the walls of the cavern and any adjacent cavern or any other manmade structures within the salt stock." *See* La. Administrative Code §43:3315(B)(2). For solution-mining caverns permitted prior to the effective date of the regulations, that are already within 200 feet of any other cavern or manmade structures within the salt stock, however, the Commissioner may approve continued operations upon a proper showing by the owner or operation that the cavern is capable of continued safe operations. *Id.*

Pursuant to these regulations, Dow, on or about February 16, 2015, notified TBC, in writing, that the Dow 18 cavern extended to "approximately one foot" from TBC's adjacent property boundary.[5] On April 7, 2015, less than two months later, TBC commenced this action, asserting that Dow's location of the Dow 18 wrongfully deprives TBC of its ability to operate a solution-mining cavern within 200 feet of the Dow 18. Thereafter, following its subsequent receipt of various sonar surveys from Dow during the course of the litigation,[6] TBC amended its complaint to additionally allege that Dow's solution-mining cavern has encroached, and continues to encroach, *onto* TBC's property. Based on these assertions, TBC seeks injunctive relief against Dow, as well as damages from Dow for the lost value of salt that was improperly mined by Dow, and the lost value of all "dead salt" on the property that TBC and no longer legally mine because

---

[5] *See* Rec. Doc. 84-4, p. 22 of 42 - p. 23 of 42.
[6] *See* Rec. Doc. 84, p. 8.

of its proximity to Dow's cavern.[7] TBC further alleges that Dow has been unjustly enriched by its improper operation causing its cavern to extend within one foot of TBC's property.[8]

In response, Dow has filed the instant motion for partial summary judgment seeking dismissal of TBC's claims premised on Dow's solution-mining operations.[9] Specifically, Dow contends TBC's tort claims relative to those operations have prescribed and that an unjust enrichment remedy is legally unavailable.

## II. LAW AND ANALYSIS

### A. Rule 56 of the Federal Rules of Civil Procedure – Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(a),

---

[7] *See* Rec. Doc. 92.
[8] *Id.*
[9] *See* note 4.

the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S. Ct. 2553; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir. 2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *See* Fed. R. Civ. P. 56(c)(3)("court need consider only the cited materials"); *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence

supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002).

### B. Prescription Law

Louisiana Civil Code article 3492 provides, in pertinent part: "Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained." Damage is considered to have been sustained, within the meaning of Article 3492, only when it has manifested itself with sufficient certainty to support accrual of a cause of action. *Blevins v. Long Trusts,* 49,605 (La. App. 2 Cir. 2/26/15), 162 So. 3d 500, 506 (citing *Cole v. Celotex Corp.,* 620 So.2d 1154 (1993)). "When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage." LA. CIV. CODE art. 3493. Thus, as further stated in *Hogg v. Chevron USA, Inc*., 2009-2632 (La. 7/6/10), 45 So. 3d 991, 997–98 and 1001:

> [T]he commencement of prescription under [Article 3493] is triggered by actual or constructive knowledge of damage. [] Constructive knowledge has been defined by our courts as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. *Campo v. Correa,* 01–2707, p. 12 (La.6/21/02), 828 So.2d 502, 510–511. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry might lead, and such information or knowledge as ought to reasonably put the injured party on inquiry is sufficient to start the running of prescription. *Id.* In assessing whether an injured party

6

> possessed constructive knowledge sufficient to commence the running of prescription, this court's ultimate consideration is the reasonableness of the injured party's action or inaction in light of the surrounding circumstances. *Id.*; *Griffin v. Kinberger,* 507 So.2d 821, 824 n. 2 (La.1987).
>
> * * *
>
> It is firmly established that, in cases in which a plaintiff suffers some but not all of his damages, prescription runs from the date on which he first suffers actual and appreciable damage, even though he may thereafter come to a more precise realization of the damages he has incurred or incur further damage as a result of the completed tortious act.
>
> * * *
>
> While prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong, and should not be used to force a person who believes he may have been damaged in some way to rush to file suit, a plaintiff is responsible to *see*k out those whom he believes may be responsible for a specific injury. *Jordan v. Employee Transfer Corporation,* 509 So.2d 420, 423 (La.1987). In a case involving constructive knowledge, the time when prescription begins to run depends on the reasonableness of a plaintiff's action or inaction. *Id.*

Relative to burden of proof, "[o]rdinarily, the party pleading the exception of prescription bears the burden of proving the claim has prescribed. However, when the face of the petition reveals that the plaintiff's claim has prescribed, the burden shifts to the plaintiff to show why the claim has not prescribed. *Hogg*, 2009-2632, p. 7; 45 So. 3d at 998 (citing *Lima v. Schmidt,* 595 So.2d 624, 628 (La.1992))." When, as here, prescription is raised by motion for summary judgment, rather than by peremptory exception, "the movant is required to prove, based solely on documentary evidence and without the benefit of testimony at a hearing, that there is no genuine material factual issue in dispute regarding the date upon which the plaintiffs acquired actual or constructive knowledge of the damage sufficient to commence the running of prescription." *Id.* at

7

8; 45 So. 3d at 998 (citing *Labbe Service Garage, Inc. v. LBM Distributors, Inc.,* 94–1043, p. 10 (La. App. 3 Cir. 2/1/95), 650 So.2d 829).

Lastly, prescriptive statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished. Thus, when presented with two possible constructions, the court should adopt the construction which favors maintaining, as opposed to barring, an action. *See, e.g., Unlimited Horizons, LLC v. Parish of E. Baton Rouge,* 99–889, p. 6 (La. App. 1 Cir. 5/12/00), 761 So.2d 753, 758 (citing *Miley v. Consolidated Gravity Drainage District No.* 1, 93–1321, p. 6 (La. App. 1st Cir.9/12/94), 642 So.2d 693, 697).

C. **Application of Legal Principles**

As set forth above, Dow contends that TBC's tort claims based upon Dow's solution-mining operations were not timely filed.[10] In support of this assertion, Dow argues that TBC had sufficient actual or constructive knowledge – more than one year prior to the April 7, 2015 filing date of this action – that the outer boundary of the Dow 18 cavern was impermissibly close to TBC's property line. Specifically, Dow maintains that the one-year prescriptive period commenced, at the latest, on March 26, 2014, such that the claims prescribed before suit was filed. TBC, in contrast, argues prescription commenced, at the earliest, on April 26, 2014, such that the instant lawsuit was timely filed on April 7, 2015.

The varying dates proffered by the parties stem from TBC's receipt of a report prepared by Joe Ratigan, in July 2013, and email correspondence between persons employed by TBC and its subsidiary, United Brine Services, in March and April 2014. Relative to those dates, the Louisiana Department of Natural Resources, Office of Conservation ("DNR"), in the wake of the salt dome collapse leading to the August 2012 appearance of the Bayou Corne sinkhole, issued a directive to

---

[10] *See* note 4.

all operators-of-record of solution-mined salt caverns. The January 30, 2013 directive required the operators to "demonstrate the proximity of the outer walls of their respective salt caverns to the periphery of the salt stock" by providing an "updated top-of-salt/periphery-of-salt structure contour map" showing the "horizontal configuration of the salt cavern" and "reflect[ing] the cavern's maximum lateral extent as determined by the most recent sonar caliper survey."[11] The Operators of the Napoleonville Salt Dome ("Operators"), including Dow and TBC, retained Joe Ratigan to issue a single, dome-wide response on their behalf to satisfy the January 30, 2013 DNR Directive. Thereafter, on July 25, 2013, Ratigan transmitted the Operators' report and the required map (the "Ratigan Report") to the DNR and each of the Operators.[12]

Eight months later, on March 26, 2014, Ted Grabowski, President of TBC, and Joel Warneke, Manager of Wells for United Brine Services, a TBC subsidiary, exchanged emails regarding the map, depicting all the wells on the Napoleonville Salt Dome, that is Appendix "D" to the Ratigan Report.[13] John Sergo, Brian Rapp, Matt Slezak, and Mark Cartwright were copied on the messages. On April 17, 2014, John Sergo provided the additional ownership information that Grabowski had requested in his March 26th email. Ten days later, on April 27, 2014, that Grabowski of TBC contacted Steve Mims, at Dow, for the purpose of discussing their companies' wells and respective property lines. The text of the emails are set forth in SEALED ATTACHMENT "A."[14]

In support of its assertion that prescription began to run on March 26, 2014, Dow points to Warneke's email message to Grabowski, which discussed the map included with the July 25, 2013

---

[11] *See* Rec. Doc. 77-4, p. 6 of 42 – p. 8 of 42; *see also* Rec. Doc. 77-4, p. 17 of 42.
[12] *See* Rec. Doc. 84-3, p. 5 of 42 - p. 36 of 42.
[13] *See* Rec. Doc. 84-3, p. 35 of 42 - 36 of 42.
[14] The emails are set forth in a sealed attachment, rather than the text of this document, because they have been designated as being subject to a protective order. *See* Rec. Doc. 23.

Ratigan report, and characterized the Dow 18 cavern as "very close/right on the TBC/Dow property line."[15] Specifically, Dow contends this particular communication provided sufficient notice to TBC, more than one year prior to filing suit, of damage sufficient to commence the running of prescription. TBC disagrees, contending Warneke's March 26, 2014 comment was nothing more than a "preliminary identification of the possibility of an encroachment issue raised by the promulgation of new Louisiana solution-mining regulations in February of 2014."[16] TBC further maintains that it could not and did not have "an accurate and meaningful understanding" of the Dow 18 cavern's location relative to TBC's adjacent property, and whether the Dow 18 cavern encroached "on or near TBC's property," until John Sergo's April 17, 2014 email response to TBC's president, Grabowski, regarding the locations of TBC's property lines on the Napoleonville Salt Dome.[17]

Neither party's position regarding prescription is frivolous. Rather, sound arguments exist on both sides of this issue. On one hand, it apparently was Warneke's March 26, 2014 email (regarding the seeming proximity of the Dow 18 cavern's border to TBC's property) that caused Grabowski to direct John Sergo to have someone add TBC's "fee property lines" to the map included in Ratigan's report, yielding much the same map as that attached as Exhibit 1 to TBC's April 7, 2015 complaint.[18]

On the other hand, however, the Ratigan report and map address the "proximity of the outer walls of their respective salt caverns to the periphery of the salt stock," not the distance between existing salt caverns or cavern proximity to adjacent property lines.[19] Nor, significantly,

---

[15] *See* Sealed Attachment "A."
[16] *See* Rec. Doc. 84, p. 24 of 28.
[17] *See* Rec. Doc. 84, p. 23 of 28 – p. 24 of 28; Rec. Doc. 84-4, p. 36 of 42 – p. 37 of 42.
[18] *See* Rec. Doc. 77-2, p. 14 of 27 and 18 of 27; Rec. Doc. 77-4, p. 42 of 42; Rec. Doc. 77-5, p. 17 of 22; Rec. Doc. 84-3, p. 36 of 42; and Rec. Doc. 1-1.
[19] *See* Rec. Doc. 84-3, p. 4 of 42 at ¶21.

were the report and map prepared for the latter purposes.[20]  Indeed, the map included in the Ratigan report expressly states in Note 5: "LOCATION OF PROPERTY BOUNDARIES, HIGHWAYS, ROADS, AND BAYOUS ARE APPROXIMATE."[21]  Furthermore, as recognized by the parties, the sonar measurements reflected in the Ratigan report and map have a rate of error of approximately 3–5%," and the "uncertainty associated with radii measurements in the wing [of the Dow 18 cavern] may be up to 5% or greater," such that "there could be an uncertainty of ± 34-38 feet or more in the actual location of the maximum extent of the cavern relative to the property line."[22]

Finally, the regulatory distance restrictions on which TBC's claims are based were not promulgated until February 20, 2014, *i.e.,* little more than one month prior to Warneke's March 26, 2014 email to Grabowski.  In fact, despite also having had possession of the Ratigan report and map, as well as multiple sonar measurements taken between August 1991 and September 2010, with some showing the Dow 18 cavern actually had crossed TBC's property line,[23] Dow itself did not provide the statutorily required notice of encroachment to TBC until February 15, 2015.[24]

In the end, the question of prescription requires a reasonableness determination in light of the surrounding circumstances and has been presented to the Court by means of a summary judgment motion, which requires the evidence to be viewed in favor of the nonmoving party and

---

[20]     *See* Rec. Doc. 84-3, p. 4 of 42 at ¶20; *see also* Rec. Doc. 77-4, p. 10 of 42.
[21]     *See* Rec. Doc. 77-4, p. 41 of 42; *see also* Rec. Doc. 84-3, p. 4 of 42 at ¶21. Significantly, there is no showing that Joe Ratigan was charged with preparing a report or map reflecting accurate property lines for each of the entities owning property along with the exact locations of caverns vis-à-vis those property lines and the other caverns.
[22]     *See* Rec. Doc. 77-2, p. 20 of 27 (citing Rec. Doc. 55 at ¶ 23); *see also* Rec. Doc. 84-2, p. 3 of 42 and p. 5 of 42.
[23]     *See* Rec. Doc. 84, p. 7; Rec. Doc. 84-2, p. 3 of 42.  The sonar measurements were not provided to TBC prior to the commencement of this litigation.
[24]     *See* Rec. Doc. 84-4, p. 22 of 42.

all reasonable inferences to be drawn in favor of that party. Furthermore, as set forth above, prescription statutes are strictly construed and, when two possible reasonable constructions exist, that favoring maintenance of the action is applied. Accordingly, considering the entirety of the foregoing, the Court, on the instant showing made, is not presently convinced that TBC was required, *as a matter law*, to file suit against Dow on or before March 26, 2015, rather than the actual filing date of April 7, 2017. Accordingly, Dow's request that TBC's solution-mining claims be summarily dismissed as untimely, is denied.[25]

New Orleans, Louisiana, this 28th day of August 2017.

**KURT D. ENGELHARDT**
**United States District Judge**

---

[25] As set forth in its motion, Dow also seeks dismissal of TBC's unjust enrichment claim. Given that the remainder of the relief sought by Dow's motion has been denied, the Court will forgo evaluating the viability of TBC's unjust enrichment claim at this stage of the proceeding. Nevertheless, the Court notes, as cited by Dow, that an unjust remedy is available only when there is "no other remedy at law available to [a] plaintiff." *See* Rec. Doc. 77-2, p. 25 of 27. Hence, TBC's counsel is urged to reconsider the claims legal viability and, if warranted, voluntarily dismiss it.