

January 13, 2016

James M. Garner
Sher Garner Cahill Richter Klein & Hilbert, L.L.C.
909 Poydras Street, Twenty-eighth Floor
New Orleans, Louisiana  70112

Subject: Technical Review – Texas Brine / Dow Litigation Support

The letter report summarizes the results of a review of technical documents related to the encroachment of Dow 18 on the northern property line of Texas brine Tract 4B undertaken by Geostock Sandia, LLC (GKS) on behalf of Sher Garner Cahill Richter Klein & Hilbert, L.L.C.

**TRACT 4B PROPERTY LINE**

The property description given in the "*Bill of Sale*" dated December 27, 2002 was used to develop NAD 83 coordinates for the boundary of Tract 4B which is adjacent to Dow 18. This description is consistent with Enron Storage Company drawing number C37-111-06 revised April 25, 2000 which is attached to the "*Bill of Sale*". The description is provided as series of bearings and distances from a point of reference along with a starting and ending point. The process involves calculating the coordinates for the beginning point based on the bearings and distances from the reference point and then continuing sequentially calculating coordinates using the given bearings and distances until the ending point is reached. Ideally, the coordinates for the ending point should be identical to the coordinates for the starting point. In practice, round off errors occur in the calculations. The beginning and end point from these calculated coordinates agree within 0.020 feet which is considered good agreement. The property line described in the letter from The Dow Chemical Company to Texas Brine Co., LLC (document not dated) with the subject "*Notice of Property Boundary*" (DOW_TBC000162 to DOW_TBC000165) is in substantial agreement (less than 0.5 feet difference along the property line adjacent to the cavern boundary). The property line described in the "*Bill of Sale*" is south of the property line shown on DOW_TBC000164 and is conservative in that it places the centerline of the sonars further from the common property line.

GEOSTOCK SANDIA, LLC
8860 Fallbrook Drive, Houston, TX 77064
Tél. : (346) 314 4347 - Fax : (832) 478 5172
http://www.geostocksandia.com

Exhibit J





It should be noted the RSI-1800-13-399 (Case 2:15-cv-01102-KDE-SS Document 21-4 Filed 09/24/2015 Page 41 of 42) as part of the Affidavit of Jeff Hertzing indicates the location of property boundaries are approximate (see Note 5 on drawing).


**SURFACE AND SUBSURFACE LOCATION OF DOW 18**

The surface coordinates for the Dow 18 well were taken from the July 2013 PB-Energy report "*Proximity of Class II and Class III Well Caverns to the Edge of the Napoleonville Salt Dome*" (Case 2:15-cv-01102-KDE-SS Document 21-4 Filed 09/24/2015 Page 38 of 42) as part of the Affidavit of Jeff Hertzing.

This report does not give the coordinates for the location of the borehole just above the cavern. This is important as most wells are deviated to some degree relative to their surface location. The deviation typically increases with depth. It is common practice to use a gyroscopic directional survey to establish the northing and easting coordinate offset distances of the production casing shoe relative to the well surface location. It is then generally assumed all sonar surveys are relative to this point assuming the wellbore is approximately vertical below this point. The production casing shoe for Dow 18 is located at 2,008 feet. A March 15, 1986 gyroscopic directional survey conducted by Scientific Drilling International shown in Figure 1 indicates the production casing shoe is 16.21 feet west and 6.33 feet south of the well surface location. The wellbore deviates further to the west and south below the production casing shoe based on the directional survey. The roof of the cavern was at approximately 2,835 feet at the time of the March 11, 2007 sonar. The gyroscopic directional survey indicates the original wellbore was 24.78 feet west and 11.35 feet south of the well surface location at 2,835 feet (see Figure 1). However, a review of the March 11, 2007 and March 21, 2008 sonars of the borehole between the production casing shoe and 2,835 feet indicates almost all of the deviation below 2,008 feet had been eliminated by borehole enlargement due to exposure to water or under saturated brine over time. The residual deviation to the south is probably less than 1 foot and less than 2 feet to the west. Therefore, it is reasonable and conservative to assume all sonars surveys are relative to the production casing shoe in that it places the centerline of the sonars further from the common property line.



**SONAR SURVEYS**

Sonar surveys measure the transit time of a reflected acoustic beam from the tool to the surface of the cavern and back to the tool. This transit time combined with the speed of sound in the brine is used to determine the distance from the tool to the wall of the cavern. The speed of sound adjacent to the sonar tool is measured and is assumed to be the same along the path of the acoustic beam out to the wall of the cavern. This is considered to be a reasonable assumption. The acoustic beam spreads with distance just as a conventional flashlight beam does. The operator picks up reflections from a larger surface area the greater the distance to the wall of the cavern. This introduces increasing uncertainty in determining the distance to a particular point on the cavern surface since the signal is reflected from a larger area. This problem is even greater when trying to determine the distance to the backside of a relatively narrow wing located a distance approaching the limitations of the sonar tool. The operator will see reflections not only from the wall in the wing but also from off the roof and floor of the wing. This makes identifying the correct signal and the distance to the outer extremity of the wing even more uncertain.

A sonar conducted in a cavern with no suspended hanging strings in the cavern interval and with no unusual or highly irregular surface geometry probably has an uncertainty for the measured volume of the order of 1-3%. This is equivalent 0.5-1.5% for measured radii. For highly irregular caverns and/or caverns with very larger diameters like Dow 18, or sonars conducted through the suspended hanging strings, the uncertainty is greater. The uncertainty associated with radii measurements in the wing may be up to 5% or greater.

Sonarwire uses a magnetic compass to establish a compass bearing for each measurement to the cavern surface. Sonarwire does not correct their sonars to true north. It is possible to correct these bearings to true north by using the magnetic declination for a specified location and date based on the International Geomagnetic Reference Field model. The magnetic declination varies from 1.075 degrees east to 0.653 degrees east from March 11, 2007 to September 28, 2010. No correction was made since the magnitude and variation of the magnetic declination was limited over the time period of interest.

There have been 11 sonar surveys conducted between August 31, 1991 and September 28, 2010. Figure 2 show the maximum radii plots for each of these sonars relative to the Tract 4B property line. The May 6, 2002 and December 4, 2003 sonars indicated Dow 18



at its closet point was approximately 270 to 275 feet, respectively, from the southern property line for Tract 4B.

Following the December 4, 2003 sonar, solution mining continued at a reduced rate until the next sonar, which was conducted on March 11, 2007. During this period the average volume creation rate was 4,089 barrels per day. This equivalent to approximately a 677 gpm brine production rate. The March 11, 2007 sonar indicated Dow 18 was approximately 1 foot from the property line. A very pronounced wing had developed between 2,836 and 2,860 feet. <u>At this point Dow should have been aware they were potentially encroaching on the neighboring property</u>. With such a dramatic change in cavern diameter Dow should have investigated to determine how close they were to the property line.

Solution mining continued at a somewhat reduced rate through September 5, 2007. During this period the average volume creation rate was 2,345 barrels per day. This equivalent to approximately a 388 gpm brine production rate. Another sonar was conducted on September 5, 2007 which indicated Dow 18 was now 16 feet beyond the property line. The wing was between 2,834 and 2,858 feet (no material change in the depth interval for the wing). <u>Dow should have given notice to Texas Brine that they had crossed the property line and either stopped mining or adjusted their mining to prevent further encroachment.</u>

Solution mining continued at an increased rate through March 21, 2008. During this period the average volume creation rate increased to 4,346 barrels per day. This equivalent to approximately a 719 gpm brine production rate. Another sonar was conducted on March 21, 2008 which indicated Dow 18 was now 26 feet beyond the property line. The wing was between 2,835 and 2,858 feet (no material change in the depth interval for the wing).

Solution mining continued at a much reduced overall rate through September 25, 2008. During this period the average volume creation rate was 578 barrels per day. This is equivalent to approximately a 96 gpm brine production rate. Another sonar was conducted on September 25, 2008 which indicated Dow 18 was no longer across the property line. It was within 13 of feet of the property line, if taken in isolation without considering the previous three sonars. Under these circumstances, it is improper to take this sonar in isolation, as it must be read in conjunction with all other available sonars. Given the pattern of cavern enlargement from the previous three sonars as mining



continued, this sonar should have raised further questions. The interval for the wing appeared to have moved up to between 2,826 and 2,846 feet.

Solution mining continued at a reduced overall rate through September 28, 2010. During this period the average volume creation rate increased to 432 barrels per day. This equivalent to approximately a 72 gpm brine production rate. The final sonar was conducted at this time which indicated Dow 18 was no longer across the property line. It was now within 2 of feet of the property line, if taken in isolation without considering the previous sonars. Under these circumstances, it is improper to take this sonar in isolation, as it must be read in conjunction with all other available sonars. The interval for the wing was between 2,826 and 2,846 feet (no material change in the depth interval for wing from last sonar).

Figure 3 shows an expanded view of the maximum radii plots for the 2007 through 2010 sonars.

It is also worth noting that all of the sonars from 2007 through 2010 were conducted by Sonarwire which does offer a certain level of consistency. However, three different operators conducted the five sonars. This can introduce some bias (assumed to be minor) in interpretation. Both 2007 sonars were conducted by Sean McCool. Both 2008 sonars were conducted by Gary McCool. The final 2010 sonar was conducted by Brent Grubbs.

As noted earlier in this section the uncertainty in the measured wing radii may be of the order of 5% or greater. This means there could be an uncertainty of ± 34-38 feet or more in the actual location of the maximum extent of the cavern relative to the property line. Given the difficulties in getting good radii measurements in a narrow wing as described in the first paragraph of this section, the maximum extent of the cavern cannot be determined by just examining a single sonar. The pattern of cavern development based on all the sonars must be considered. Individual sonars cannot be taken in isolation.  In order to accurately determine the size and shape of a cavern, including the dimensions and potential encroachment of any wing in the cavern, one must read all available sonars together. Looking at all of the sonars conducted between 2007 and 2010, not just an individual sonar, and given the uncertainty in the sonar measurements, it is highly probable all of the sonars from 2007 forward are across the Tract 4B property line.



**CAVERN DEVELOPMENT**

**Property Line Encroachment**

A general overview of cavern development over time may be derived from the sonars. The discussion below focuses on the sonars from 2001 to 2010. North-South sonar profiles are used to illustrate cavern development. It should be noted the North-South profiles are a close approximation to the orientations with the closest approach/encroachment of the Texas brine property line.

Figure 5 (DOW_TBC000401) shows a North-South profile of the cavern on June 24, 2001. At this time the roof of the cavern was at approximately 2,935 feet and the maximum cavern extension to the south was 319 feet. The distance to the Tract 4B property line due south of the well bottom-hole location at 2008 ft is 705 feet.

By the time of the May 6, 2002 sonar the 13-3/8" hanging string was re-positioned at 2,857 feet and the 8-5/8" hanging string was positioned at 3,111 feet. The diesel blanket was at approximately 2,855 feet. Solution mining was now in reverse mode – meaning raw water was being injected down the 13-3/8" x 8-5/8" annulus and brine was being produced up the 8-5/8" inner hanging string. Cavern development was occurring primarily between the new diesel blanket level at 2,855 feet and the previous cavern roof of 2,935 feet. Raw water is dissolving more salt near the point of injection and less as it picks up salinity moving down toward the previous roof location. This is shown in Figure 6 (DOW_TBC000612). Once the under saturated brine drops below the previous roof of the cavern it is mixing with a very large volume of nearly saturated brine in this part of the cavern and consequentially dissolves very little salt below the old 2001 roof. This strategy appears to be aimed at moving the cavern interval up while maintaining the production of nearly saturated brine and at the same time not significantly enlarging the overall cavern diameter (331 feet to the south).

At the time of the December 4, 2003 sonar, Figure 7 (SNRWIRE036), the diesel pad location and hanging string locations were essentially unchanged from the May 6, 2002 sonar. At this point in time the cavern interval between 2,854 feet and the old 2001 roof location of 2,935 feet had reached a similar diameter as the lower part of the cavern.

Three plus years passed before the next sonar on March 11, 2007. The roof of the cavern is now at approximately 2,835 feet (about 20 feet higher).  It appears Dow continued with the same basic solution mining plan of injecting raw water down the 13-3/8" x 8-5/8" annulus and producing brine up the 8-5/8". <u>Dow should have anticipated a dramatic</u>



increase in the overall cavern diameter near the roof with this solution mining plan. The cavern radius to the south is now 695 feet.  This is more than double the radius to the south from the sonar on December 4, 2003. As may be seen in Figure 8 (DOW_TBC000458), the 2002 and 2003 sonars were also plotted with the 2007 sonar. It is common to have previous sonars plotted with the current sonar to see progressive cavern growth. As noted previously, Figure 8 (DOW_TBC000458) should have alerted Dow there was a potential for encroachment.

Following the March 11, 2007 sonar Dow moved the 13-3/8″ hanging string to 2,728 feet and the 8-5/8″ string to 2945 feet (10 feet below the 2001 cavern roof). The diesel pad location at the time of the September 5, 2007 sonar was approximately 2,500 feet as shown in Figure 9 (DOW_TBC000660). The strategy appears to have been similar to the previous cavern development, but trying to restrict development to the interval above 2,835 feet (i.e. no further enlargement of the wing). This basic strategy continued up to the March 21, 2008 sonar. At this time the diesel pad was at the same approximate depth of 2,500 feet. Cavern development was predominately above 2,835 feet. As may be seen in Figure 10 (DOW_TBC000537), there was not much change in the wing interval.

At the time of the September 25, 2008 sonar the diesel interface was at 2,277 feet, the 13-3/8″ was at 2,722 feet and the 8-5/8″ was at 2,817 feet. These string depths moved the active solution mining interval further above the wing interval. Figure 11 (DOW_TBC00725) shows the North-South cavern profile.

The final sonar was run on September 28, 2010. String setting depths remained the same. The roof was now at 2,472.5 feet as may be seen in Figure 12 (DOW_TBC000179). The wing interval remained essentially unchanged.

### Additional Continuing Issue

As discussed above, following the March 11, 2007 sonar Dow moved the 13-3/8″ hanging string to 2,728 feet and the 8-5/8″ string to 2,945 feet (10 feet below the 2001 cavern roof). The diesel pad location at the time of the September 5, 2007 sonar was approximately 2,500 feet as shown in Figure 13 (DOW_TBC000663). This figure represents a Southwest-Northeast profile. At this point in time there is no apparent issue. By time of the March 21, 2008 sonar a protrusion is starting to develop to the Southwest between 2,550 and 2,625 feet as seen in Figure 14 (DOW_TBC000540). By the time of the September 25, 2008 sonar as seen in Figure 15 (DOW_TBC000728) the protrusion is developing at roughly a 45 degree upward angle to the Southwest. Figure



16 (DOW_TBC000182) shows the September 28, 2010 sonar which appears to indicate no additional upward development. This development is of concern because the protrusion/extension developed below the protective diesel pad and is probably unprotected by the diesel pad and therefore can continue to develop both laterally and upward over time.

This protrusion/extension may be a result of a weaker zone of salt which dissolves faster. It may also be a result of encountering a zone which includes some amount of more water soluble potassium chloride minerals such as sylvite. If this is the case this zone will continue to develop even though the bulk brine in the cavern is saturated with respect to sodium chloride. Potassium chloride will precipitate out of solution to allow the potassium based minerals to continue to dissolve. This process will continue until the bulk brine in the cavern is saturated with respect to both sodium and potassium chloride. Dow has not presented any information to allow the cause of the protrusion/extension to be identified. If this protrusion/extension were to continue to grow it could represent a continuing and growing risk to the integrity of Dow 18 and subsequently to neighboring caverns.

## JEFF HERTZING TESTIMONY AND AFFIDAVIT

Mr. Jeff Hertzing acknowledged in his deposition on September 7, 2016 he used a base map with well locations provided to him in the early nineties (page 76, lines 4-5). Mr. Hertzing said prior to his May 26, 2016 deposition he had never verified the accuracy of the wellhead location or the location of the bottom of the well (page 76, lines 6-25, page 77, lines 1-4). Since his May 26, 2016 deposition he confirmed at request of counsel the Dow base map used the well surface location, not the bottom hole location (page 77, lines 13-25, page 78, lines 1-8). He stated he had not done anything to verify the property boundary on the Dow base map (page 79, lines 23-25, page 80, lines 1-3). In summary, Mr. Hertzing as of his deposition on September 7, 2016, did not know exactly where the Dow 18 cavern is relative to the property boundary.

Jeff Hertzing states in his affidavit "*In fact, due to the natural cavern creep, or salt creep closure due to the movement of the salt walls towards the center of the cavern, the large diameter and extent of the cavern wing gradually reduces over time*." (Case 2:15-cv-01102-KDE-SS Document 21-4 Filed 09/24/2015 Page 4 of 42).  He may be suggesting the reduction in the extent of the wing indicated in the last two sonar can be attributed



to salt creep. This suggestion is incorrect. Salt creep is a very real phenomenon. However, it is a slow process which can take many years to decades for cavern movement of this magnitude to occur. Cavern movements indicated by the sonars of the Dow 18 cavern cannot be accounted for by cavern creep. Cavern creep cannot account for the approximately 39 foot difference in cavern measurements over a mere 6 month span indicated by the March 21, 2008 and September 25, 2008 sonars. Cavern creep further cannot account for even the approximately 28 foot difference over a 2-1/2 year span indicated by the March 21, 2008 to September 28, 2010 sonars. Salt creep sufficient to cause cavern movements of this magnitude would also probably result in significant surface subsidence above the cavern.

A partial collapse of the salt at the extremities of the wing due to high stresses and or excessive salt creep could have filled the outer extremity of the wing with rubblized salt. This would give the appearance to the sonar that the wall had moved inward. However, this does not reduce the distance to the outer most extremity of the wing. The rubblized salt is still hydraulically connected to the rest of the cavern and therefore does not really reduce the extent of encroachment.

The magnitude of change in the lateral extent of the cavern relative to the property line is probably more related to the uncertainty in the sonar measurements (see uncertainty discussion above).

**SUBSIDENCE**

Dow 18 now has a maximum diameter of 1,580 feet as a result of the wing which developed between 2,826 and 2,846 feet. The main body of the cavern has a maximum diameter of approximate ½ the maximum diameter. The broad extent of the wing does pose an ongoing increased risk for well/cavern failure which could result in significant surface subsidence or the development of a sinkhole over time. This cavern failure scenario would impact any cavern development in proximity to Dow 18. The rate of subsidence above Dow 18 increased during the period the wing was developing as shown in Figure 4. After Dow stopped solution mining the cavern and implemented a pressure maintenance program, the rate of subsidence has reduced back to levels similar to pre-wing development.



**RULE 26(a)(2)(B)(ii) LIST OF MATERIAL CONSIDERED**

- Deposition of Jon Jeffrey Hertzing, Vols. I and II
- Defendants' Motion for Summary Judgment and all briefing and exhibits attached thereto including, without limitation, the affidavit of Jon Jeffrey Hertzing, dated September 23, 2015, and all exhibits attached thereto
- Dow discovery responses and document production, bates-labelled DOW_TBC 000001-001417; including, without limitation, Sonar surveys located at DOW_TBC 000166-000230, 00039-000383, 000387-000765; and Directional survey located at DOW_TBC 000315-000318
- Sonarwire subpoena responses, bates-labelled SNRWIRE 001-567
- Enron Storage Company drawing number C37-111-06 revised April 25, 2000 which is attached to the "Bill of Sale"
- "Bill of Sale" dated December 27, 2002
- https://www.ngdc.noaa.gov/geomag-web/#igrfwmm
- http://geomag.nrcan.gc.ca/calc/mdcal-en.php


**QUALIFICATIONS, AREAS OF EXPERTISE, AND COMPENSATION**

I am Vice President of Engineering and Geology for Geostock Sandia, LLC. Geostock Sandia is part of the Geostock group.

Geostock is an international consulting, engineering and operations group and a key player in the underground storage of liquid, liquefied and gaseous hydrocarbons. Founded in 1965, the company has acquired unique know-how in its field. The Geostock group is made up of the Geostock Holding Company, whose shareholders are the Entrepose Group and Vinci Group - (90%) and Total (10%) and a number of other subsidiaries and interests all over the world, offering know-how in the field of underground storage.

My business address is 8860 Fallbrook Drive, Houston, Texas 77064.

I received a B.S. degree in mineral engineering from the University of Alabama and a M.S. degree in Mining Engineering from the Pennsylvania State University. I have thirty seven years of experience in the engineering, development and operation of



underground storage facilities for natural gas, compressed air, liquid hydrocarbons, and various types of waste products. I have particular expertise in the areas of solution mining, well planning, geomechanics, inventory verification, mechanical integrity testing and thermodynamics of storage operations. My experience covers engineering, construction and operational aspects of underground storage. I have taught short courses on solution mining, mechanical integrity testing of storage wells, and various aspects of constructing and operating storage caverns.

I have been actively involved in the Solution Mining Research Institute (SMRI) since 1986. I have served as Program Chairman, Secretary-Treasurer, Vice-President & Research Committee Chairman and President of the organization. I has served on the Executive Committee for the Gas Storage Technology Consortium and the Underground Storage Committee for the Pipeline Research Council International (PRCI). I served as a reviewer American Petroleum Institute (API) Recommended Practice RP-1170 - Design and Operation of Solution-mined Salt Caverns Used for Natural Gas Storage. My resume is attached and includes a list of my publications and additional details regarding my qualifications, and experience.

I have provided expert opinion reports for the Bayou Corne Sinkhole litigation.

I am being compensated at a rate of $245 per hour for time spent preparing my expert report and $285 per hour for deposition and trial testimony if required.

The scope of this report is limited pursuant to the parties' stipulation, and I reserve the right to issue further reports in this litigation.

I declare, under penalty of perjury, pursuant to 28 U.S.C. section 1746 that the foregoing is a true and correct statement of my opinions, analyses, and conclusions.


Charles R. Chabannes
Vice President Engineering & Geology
Geostock Sandia, LLC
8860 Fallbrook Drive
Houston, TX 77064