UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| TEXAS BRINE COMPANY, LLC, ET AL. | * | CIVIL ACTION NO. 15-1102 |
|---|---|---|
| | * | c/w No. 15-3324 |
| VERSUS | * | SECTION: "N"(1) |
| DOW CHEMICAL COMPANY, ET AL. | * | JUDGE KURT D. ENGELHARDT |
| | * | |
| | * | MAGISTRATE JUDGE |
| *Applies to all cases* | | JANIS VAN MEERVELD |

ORDER AND REASONS

Before the Court is the Motion to Quash filed by non-party Occidental Chemical Corporation ("Oxy") (Rec. Doc. 334) and the related Motion to Compel filed by plaintiffs Texas Brine Company, LLC ("Texas Brine") and Louisiana Salt, LLC (Rec. Doc. 366). For the following reasons, the Motion to Quash is GRANTED and the Motion to Compel is DENIED.

Background

In this lawsuit, Plaintiff Texas Brine Co. ("Texas Brine") alleges that solution mining cavern Well Serial # 971667 located in Assumption Parish, Louisiana ("Dow # 18") has encroached onto or within one foot of property owned by Texas Brine at the time of filing suit and now owned by plaintiff Louisiana Salt, LLC ("Louisiana Salt" and with Texas Brine, the "Plaintiffs"). During the relevant time period, Dow # 18 was operated by Dow, and owned by Clifton. Texas Brine alleges that as a result of the encroachment, Defendants have mined salt belonging to Texas Brine and they have deprived Texas Brine of its ability to operate solution mining operations as close to its property line as it otherwise would have been able to do.

Texas Brine filed this lawsuit on April 7, 2016 (Rec. Doc. 1), it filed its First Amended Complaint (Rec. Doc. 5) on August 7, 2015, it filed its Second Amended Complaint (Rec. Doc.

1

55) on July 1, 2016, and it filed its Third Amended Complaint on February 9, 2017, joining Louisiana Salt as a plaintiff. The Plaintiffs seek damages as well as injunctive relief prohibiting Dow from further operation of Dow #18. Trial is currently set to begin on March 26, 2018.

Discovery Issue

The parties are before the Court regarding a subpoena issued by Texas Brine to Oxy seeking documents related to a business relationship between Oxy and Boardwalk Louisiana Midstream, LLC ("Boardwalk"), a competitor of Texas Brine in the salt brine industry. Oxy is a consumer of brine from places like the Napoleonville Salt Dome (the "Dome") where the issues in this lawsuit arise. For decades, Texas Brine has supplied Oxy with brine from the Dome. In 2012, a sinkhole occurred in Bayou Corne, near the Dome, and Oxy and Texas Brine were both parties to the resulting litigation ("Sinkhole Litigation").

Texas Brine first reached out to Oxy regarding the present lawsuit in November 2017, when it sought to produce certain confidential transcripts and expert reports from the Sinkhole Litigation to Dow. It appears the parties were able to reach a compromise regarding both the transcripts, which were produced with certain redactions, and the expert reports, which were produced subject to an attorney's eyes only provision that allowed Dow's counsel to review, but not use, the reports.

Plaintiffs issued the subpoena for documents to Oxy on January 10, 2018. It provided a January 15, 2018, response date. The parties agree that pursuant to the Sinkhole Litigation, Texas Brine already obtained possession of a large portion of the documents sought by the subpoena. But the documents are subject to a protective order, which prohibits their disclosure or use in this litigation (or elsewhere). As summarized by Oxy, Texas Brine's subpoena seeks:

- Oxy's brine supply agreements with Boardwalk from the last five years (Request No. 1)

- All negotiations of the Boardwalk agreements (Request No. 2)
- All documents relating to royalties and payments under the Boardwalk agreements (Request No. 3)
- All documents relating to the siting, drilling, etc. of caverns pursuant to the Boardwalk agreements (Request No. 4)
- All documents from seven cases and one arbitration proceeding related to the sinkhole, in which Boardwalk royalties are analyzed, plus all transcripts, pleadings, or other documents from the sinkhole matters in which the Boardwalk agreement is even *mentioned* (Request Nos. 5 and 6)
- All documents analyzing Oxy's present and future brine demand and salt reserves, both on the Dome and *anywhere* else (Request Nos. 7-10)

(Oxy's Memo. in Support, Rec. Doc. 334-1, at 5) (emphasis in original).

Oxy complains that the subpoena is untimely because the discovery deadline has passed (or in fact, will be passing soon).[1] Oxy says that Texas Brine should not be allowed to make an "end-run" around the discovery cut off. Oxy complains that the subpoena inappropriately seeks documents Texas Brine already has in its possession and is merely an attempt to evade the protective order issued in the Sinkhole Litigation. Oxy further argues that the subpoena is inappropriate because it seeks irrelevant information that contains confidential business information, and that Texas Brine has created this problem by not engaging outside experts, and by failing to conduct a market study. It points out that Texas Brine is a competitor of Boardwalk and Dow is a competitor of Oxy. Oxy notes that because of the limited time it has had to respond to the subpoena, it is still assessing those documents that are responsive, but were not produced in the Sinkhole Litigation. Nonetheless, it says some of these requests will prove voluminous. For example, Oxy says the requests for documents analyzing Oxy's present and future demand for brine (without time or geographic limitation) could yield hundreds of thousands or even millions of documents.

---

[1] Oxy references the January 23, 2018, discovery cutoff, but that was extended to February 9, 2018, and after opposition memoranda were filed, it was again extended to February 19, 2018.

In its Motion to Compel, Texas Brine focuses on two categories of documents:

- "agreements and/or leases between [Oxy] and Boardwalk Louisiana Midstream, LLC ["Boardwalk"] for brine production or supply from the Napoleonville Salt Dome in the past 5 years" and
- "documents related to the siting, permitting, and/or drilling of solution mined well caverns in connection with the agreements and/or leases" between "[Oxy] and [Boardwalk] for brine production or supply from the Napoleonville Salt Dome in the past 5 years."

Texas Brine points out that many of the documents at issue were used "voluntarily and offensively" by Oxy in the Sinkhole Litigation to support its claim for lost profits. Further, Texas Brine says that its Vice President Bruce E. Martin served as an expert in the Sinkhole Litigation and, as is a result, is already familiar with the documents. Martin also serves an expert in this case. Although counsel for Texas Brine was careful to point out at oral argument that Martin did not use the Oxy documents in crafting his expert report here, both in its brief and at oral argument, Texas Brine seems to maintain that the Oxy documents should be produced in response to Dow's request for documents that Martin was relying on to support his opinions. (Rec. Doc. 366-1, at 5-6). Texas Brine insists the documents are relevant to their lost profit claims and critical to their ability to support their damages model by showing the price of salt per ton, the production capability of wells, and provisions regarding tax credits. And Texas Brine further argues that its requests are proportional with the needs of the case. It points out that it is not plausible for Oxy to assert that the requested documents would be burdensome to produce because Oxy has produced most of the documents to hundreds of people in the Sinkhole Litigation, and further, Oxy could simply consent to allowing Texas Brine to use the documents already in its possession. Texas Brine adds that the documents are not protected by any privilege and further, that Oxy's concerns about confidential information can be addressed by the protective order in this case.

The Court conducted oral argument on February 7, 2018.

Law and Analysis

1. *Scope of Discovery*

The Federal Rules of Civil Procedure provide that "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. Proc. 26(b)(1). Of note, with the 2015 amendment to Rule 26, it is now clear that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." Id. In assessing proportionality of discovery, the following should be considered: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. The advisory committee comments to the 2015 amendment to Rule 26 make clear that the parties and the court have a collective responsibility to ensure that discovery is proportional. The party claiming it would suffer an undue burden or expense is typically in the best position to explain why, while the party claiming the information sought is important to resolve the issues in the case should be able "to explain the ways in which the underlying information bears on the issues as that party understands them." Id. advisory committee comments to 2015 amendment. "The court's responsibility, using all the information provided by the parties, is to consider these and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." Id.

2. *Rule 45 Subpoenas*

Under Rule 45, the Court may quash or modify a subpoena that "(i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no

exception of waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. Proc. 45(d)(3); see Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 817–18 (5th Cir. 2004). The moving party bears the burden of showing that compliance with the subpoena would be unduly burdensome. Wiwa, 392 F.3d at 818; Informd, LLC v. DocRX, Inc., No. MC 16-83-JJB-EWD, 2016 WL 7478962, at *3 (M.D. La. Dec. 29, 2016). In assessing the undue burden, the Court considers "(1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." Wiwa, 392 F.3d at 818. Where a non-party is subject to a subpoena, "the court may also consider the expense and inconvenience to the non-party." Wiwa, 392 F.3d at 818. The Court should also consider whether the requested information is available from any other source. Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 377 (5th Cir. 2004) abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010).

3. *Oxy's Documents*

The parties urge the Court to consider the subpoenaed documents in two categories: 1) two Oxy-Boardwalk agreements already in Texas Brine's possession pursuant to the Sinkhole Litigation and 2) those not yet in Texas Brine's possession relating to Oxy's siting/permitting/drilling documents.

For those documents that are already in Texas Brine's possession, Texas Brine points out that there is no cost associated with production. But, as Texas Brine admits, the only reason that Texas Brine has these documents is because it received them in the Sinkhole Litigation subject to a protective order prohibiting their use outside of the Sinkhole Litigation.[2] This Court has been

---

[2] The documents were to be "maintained in confidence" and "used only for purposes of reasonably and in good faith investigating and/or providing facts and circumstances relevant to the issues involved in the [Sinkhole Litigation.]"

provided with no case law or argument supporting its authority to modify the protective order issued by the state court in the Sinkhole Litigation, so as to order that Texas Brine can use the documents it is expressly prohibited from using per the state court protective order and only obtained pursuant to that state court protective order. Thus, while as a practical matter, Oxy might be able to avoid the cost of production by simply agreeing that Texas Brine can use the documents it already has, for the purposes of the subpoena and the motions before the Court, the Court's ruling will focus on whether Oxy must produce the requested documents rather than whether Texas Brine can use documents already within its possession. As a practical matter, with regard to the cost associated with producing the documents already in Texas Brine's possession, it appears that these documents are only two contracts, which would not seem to require much cost to locate and produce in the first instance.

To answer the question of whether the documents must be produced, the Court must balance their relevance, Texas Brine's need for them, and the burden imposed on Oxy. The Court finds that for the Oxy-Boardwalk agreements, their relevance is tangential and Texas Brine's need for them, despite their insistence, is minimal. Texas Brine argues that it needs the contracts to support its damages model with market specific data, which Dow has accused Texas Brine of lacking. At oral argument, Texas Brine seemed to concede that the terms of the Oxy-Boardwalk deal could not, on their own, establish Texas Brine's damages. But, Texas Brine insists, the Oxy-Boardwalk deal terms would support or corroborate their damages model, thereby making it more likely that a jury would accept the model as accurate. At oral argument, Oxy's counsel insisted that Oxy's contracts are not "market data." Oxy's counsel pointed out that there are at least 300

---

(Rec. Doc. 334-7, at 5). They were to be disclosed to a limited category of individuals including only counsel, the court, jurors, the author of the materials, and a single designated representative of each party. Id. at 8.

chemical plants in the state of Louisiana. Oxy argues that two contracts for the supply of brine to one chemical plant cannot possibly provide "market data" to support Texas Brine's damages model. The Court agrees. The Court is not convinced that the deal terms of a negotiated contract could ever corroborate the market viability of deal terms in a speculative contract between two unrelated parties. Even if they could, the Court finds that two contracts out of the entire industry are of minimal importance to establishing market rates.

In contrast, the Court finds the burden on Oxy is great. While Oxy's counsel noted that the requested contracts only amount to two agreements, Texas Brine's request raises significant confidentiality concerns. The documents at issue contain confidential information regarding price and supply of Brine as between Oxy and Boardwalk. As noted, Oxy is a competitor of Dow and Boardwalk is a competitor of Texas Brine. Oxy says that disclosure of the requested information would reveal the price and other deal terms Oxy agreed to in its negotiations with Boardwalk. Oxy argues this would allow Texas Brine to obtain an unfair advantage in its future negotiations with Oxy.

Although Oxy has previously disclosed some of the requested documents to Texas Brine, it did so pursuant to the "highly confidential"[3] category of a protective order. Such documents were to be "maintained in confidence" and were to be disclosed to a limited category of individuals including only counsel, the court, jurors, the author of the materials, and a single designated

---

[3] Texas Brine seems to suggest that Oxy has not always treated the documents as confidential because it inadvertently produced them pursuant to the "confidential" category and later clawed back the documents and designated them as "highly confidential." This does not indicate that Oxy did not consider the documents highly confidential. To the contrary, the clawback and redesignation with a higher classification underscores Oxy's seriousness about the degree of confidentiality which it attributes to these agreements. Texas Brine also notes that the distribution list included 35 pages of individuals. But Texas Brine seems to agree that these individuals were subject to the protective order, accordingly, distribution to these individuals does not indicate Oxy failed to consider the documents confidential. Nor could Texas Brine point to any disclosure or waiver made in contravention of the protective order. It argued that Oxy used a number of confidential documents in the Sinkhole Litigation, but had no evidence that the Oxy-Boardwalk agreements were ever made public.

8

representative of each party. (Rec. Doc. 334-7, at 5, 8). Requiring production of the Sinkhole Litigation documents here would expand the disclosure list beyond those individuals. For starters, no employees at Dow—Oxy's competitor-- have seen the information. Dow's counsel in this litigation has only seen other Sinkhole Litigation documents, not the ones at issue here. And no one in the public has seen the documents. Disclosure here might even require disclosure within Texas Brine beyond the Texas Brine employees that have been previously authorized to view the documents.[4]

Texas Brine insists that because there is no absolute privilege for confidential information or trade secrets, the more appropriate procedure is not to forbid disclosure, but to instead limit disclosure with a protective order. The Court finds the cases cited by Texas Brine in support of production under a protective orderare distinguishable. First, all but one of the cases involved disclosures between parties to the litigation, not subpoenas to non-parties uninvolved with the case. Illinois Union Ins. Co. v. Louisiana Health Serv. & Indem. Co., No. CV-16-6604, 2017 WL 2955355, at *2 (E.D. La. Apr. 13, 2017) (ordering production of patient information in the files of the defendant to the plaintiff in an insurance coverage dispute, but prohibiting disclosure for any purpose other than the litigation ); Wilson v. Aegis Sec. Ins. Co., No. CV 07-7097, 2008 WL 11354987, at *1 (E.D. La. July 16, 2008) (ordering disclosure of defendant's catastrophic reinsurance treaty to the plaintiff, but prohibiting disclosure beyond the litigation); Ohio Mgmt., LLC v. James River Ins. Co., No. CIVA 06-0280, 2006 WL 1985962, at *2 (E.D. La. July 13, 2006) (same); In re Bank of Louisiana/Kenwin Shops Inc., No. CIV.A.97 MDL NO.1193, 1998 WL 817702, at *1 (E.D. La. Nov. 10, 1998) (limiting disclosure to attorneys); McKnight v. Stein

---

[4] There was some confusion at oral argument whether Texas Brine's employee Wayne Sneed has already seen the documents with the appropriate authority and whether he would be required to view them in this case for the documents to be useful to Texas Brine.

Mart, Inc., No. CIV. A. 95-0258, 1996 WL 481079, at *1 (E.D. La. Aug. 22, 1996) (requiring defendant in a racial discrimination case to produce to the plaintiff a confidential settlement it reached with another employee for purposes of discovering the facts underlying that claim, but limiting disclosure pursuant to a protective order); Laitram Mach., Inc. v. Carnitech, No. CIV. A. 92-3841, 1993 WL 370624, at *1–2 (E.D. La. Sept. 10, 1993) (ordering disclosure of information relevant to establish jurisdiction over the defendant foreign parent corporation through its relationship with its United States subsidiary was limited to plaintiff's attorneys only); Covia P'ship v. River Par. Travel Ctr., Inc., No. CIV. A. 90-3023, 1991 WL 264549, at *1 (E.D. La. Dec. 4, 1991) (ordering production of one of defendant's contracts with a non-party as relevant to defendant's basis for terminating its contract with the plaintiff and defendant's damages claim, but limiting disclosure to plaintiff's counsel). In the only case involving a non-party, the non-party was alleged to be an alter-ego of one of the defendants. KeyBank Nat. Ass'n v. Perkins Rowe Assocs., LLC, No. CIVA. 09-497-JJB-SC, 2010 WL 4866852, at *2 (M.D. La. Nov. 16, 2010) (ordering production of documents by a non-party alleged to be an alter-ego of one of the defendants pursuant to a subpoena, but limiting public disclosure pursuant to a protective order).

Second, many of the cases limited disclosure to attorneys only. Kenwin Shops, 1998 WL 817702, at *1; Laitram, 1993 WL 370624, at *1–2; Covia, 1991 WL 264549, at *1. Those that did not limit disclosure to counsel only are cases that did not involve the disclosure of confidential business information to a competitor. For example, the Illinois Union case involved an insurance coverage dispute where the court ordered production of patient information to the insurer. 2017 WL 2955355, at *2. In Wilson and Ohio Management, an insurance coverage dispute was also involved and the court ordered disclosure of the insurer's reinsurance contract to the insured. Wilson, 2008 WL 11354987, at *1; Ohio Mgmt., 2006 WL 1985962, at *2. The plaintiff in

McKnight had asserted a racial discrimination claim, and the court ordered the defendant employer to produce a confidential settlement agreement with another employee so the plaintiff could obtain the facts related to that incident. 1996 WL 481079, at *1.

Here, the subpoenaed documents would reveal Oxy and Boardwalk's confidential business information to their competitors. Yet limiting disclosure to attorneys only is not possible. It is clear that on the Texas Brine side, disclosure to at least two Texas Brine employees who also serve as experts in the case would be required. The court and the parties explored other options for protection at oral argument, such as the possibility that the contract terms be used only as data points in a range. But Oxy pointed out that this would not camouflage the identity of the information from Texas Brine or Dow principals or from jurors because the only other data is Texas Brine's own. Dow also pointed out that if such information is used in support of Texas Brine's damages claim, it would need to cross examine it in detail to distinguish the Oxy-Boardwalk deal from anything Texas Brine might be able to negotiate.

Moreover, the facts of this case are illustrative of the limits of protective orders in protecting confidential business information from disclosure and use outside of the litigation in which the documents were originally disclosed. While Texas Brine falls short of stating that its damages expert relied on the pricing in the Oxy-Boardwalk contracts in opining on reasonable prices to support its damages model, Texas Brine says it would be impossible for its expert (an employee of Texas Brine) to "pretend he does not know what is contained" in the contracts. (Rec. Doc. 366-1, at 5-6). If so, this would seem to mean that it would be impossible for those Texas Brine employees who have access to the Oxy-Boardwalk documents through the Sinkhole Litigation to pretend they do not know that information as they engage in negotiations with Oxy to try and outbid Boardwalk for business or try to obtain a better price from Oxy than they

otherwise would have thought possible. Similarly, it would seem impossible for those Dow employees who might get to see the Oxy-Boardwalk contracts for the first time through this litigation to "pretend" they do not know what they saw when they negotiate on behalf of Dow. What the facts of this case indicate is that a protective order, although it technically prohibits the use of information outside of litigation, as a practical matter may not really be able to prevent the "use" of the information in a business context.

Thus, while issuance of a protective order limiting disclosure of confidential business information rather than forbidding discovery may be the usual approach, the Court finds such protections are insufficient here. The Court concludes that the burden on Oxy outweighs the tangential relevance and importance of the information contained in the Oxy/Boardwalk agreements to the issues in this case.

As to the documents not in Texas Brine's possession, namely "documents related to the siting, permitting, and/or drilling of solution mined well caverns in connection with the agreements and/or leases" between "[Oxy] and [Boardwalk] for brine production or supply from the Napoleonville Salt Dome in the past 5 years," Oxy argues that this request could yield hundreds of thousands or even millions of documents, creating a huge burden on it to produce them. It further challenged their relevance. At oral argument, Texas Brine seemed willing to significantly narrow this request, arguing that it needs this information to show that, contrary to Dow's assertions, the Louisiana Department of Natural Resources is still issuing permits in this area to parties involved in the Sinkhole Litigation. Counsel for Texas Brine explained that it could use information about the length of time Oxy's permit applications for its property (adjacent to the property at issue here) had been pending. Counsel for Oxy pointed out that applications for permits and issued permits are matters of public record so Texas Brine can obtain this information

elsewhere. The Court will not compel Oxy to undergo the burden of producing these publically available documents. Oxy further insisted that its communications regarding permitting are not relevant to whether *Texas Brine* could obtain permits. The Court agrees that beyond the publicly available information, the permitting/siting/drilling information sought by Texas Brine is of tangential relevance and minimal importance to the issue of whether Texas Brine would be able to obtain a permit. The Court finds that the burden on Oxy to search for and review such documents outweighs the negligible relevance. Accordingly, Oxy will not be compelled to produce them.

## Conclusion

For the foregoing reasons, the Motion to Quash is GRANTED and the Motion to Compel is DENIED.

New Orleans, Louisiana, this 20th day of February, 2018.

                                         Janis van Meerveld
                                  United States Magistrate Judge